540 So.2d 358 (1989)
Nita M. DIETRICH
v.
ALLSTATE INSURANCE COMPANY, et al.
Nos. 87 CA 1271, 88 CA 0157.
Court of Appeal of Louisiana, First Circuit.
February 28, 1989.
Writ Denied April 21, 1989.
Charles R. Moore and Richard McGimsey, Baton Rouge, for plaintiff-appellant, Nita M. Dietrich.
Frank Fertitta, Baton Rouge, for defendant-appellee, Vinyl Works and U.S.F. & G.
Daniel Atkinson, Baton Rouge, for defendant-appellee, Marilyn Clark and Allstate Ins. Co.
A. Howell Andrews, Baton Rouge, for defendant-appellee, Cabana Pool Corp.
Before EDWARDS, SHORTESS, SAVOIE, CRAIN and ALFORD, JJ.
SAVOIE, Judge.
Nita M. Dietrich (plaintiff) suffered spinal injuries and is now a quadriplegic after diving into Marilyn Clark's swimming pool on July 12, 1984. Plaintiff brought suit against Clark and Allstate Insurance Company, Clark's homeowner insurer, alleging negligence and strict liability under LSA-C. C. arts. 2315 and 2317. Cabana Pool Corporation *359 (Cabana), the installer of the pool, and The Vinyl Works Company, the manufacturer of the pool's vinyl liner, were later named as defendants. Plaintiffs alleged negligence and strict liability against them as well. Clark and Allstate Insurance Company moved for summary judgment, as did Cabana, on the grounds that there was no dispute as to any material fact and that, as a matter of law, they were entitled to a dismissal. The trial court dismissed plaintiff's suit as to Clark, Allstate, and Cabana (defendants). (The Vinyl Works Company did not move for summary judgment and is not before this court on appeal.) The court held there was no breach of duty on Clark's part and the cause of the accident was plaintiff's negligence in failing to ascertain that it was safe to dive. It went on to find that the pool was not unreasonably dangerous for its intended use. Plaintiff appeals from this judgment.
The depositions of Clark, Joseph "Jim" Cazes, plaintiff, and John Barksdale, who were all present when the accident occurred, and the deposition of Kandy Bennett, a friend of the plaintiff who was with her prior to the accident, were submitted by defendants in support of their motions for summary judgment. In opposition to the motion for summary judgment, plaintiff submitted an affidavit by Frederick J. Zeretzke, a registered land surveyor who surveyed Clark's pool after the accident to determine the contour of the pool's bottom. Plaintiff also submitted the affidavit of Dr. Alexander Gabrielsen, a private consultant in aquatic safety and pool design.
The facts are as follows. On July 12, 1984, plaintiff went to the Common Point Lounge at about 5:45 p.m., to meet Bennett and Clark, with whom she had been acquainted for some time. Bennett arrived at the Common Point at 6:30 p.m.; Clark arrived between 8:00 and 8:30 p.m., accompanied by Cazes. Clark and Cazes joined the plaintiff for a drink or two, then Cazes went home shortly afterwards.
Clark suggested to plaintiff and the others at the table where they were sitting that they all go over to her residence for a swimming party. Plaintiff accepted; the others declined. Clark made a telephone call to Cazes at his home to invite him as well. Plaintiff called over to John Barksdale, who was at the bar and whom she had met once previously, and invited him to join the party. Plaintiff, Clark, and Barksdale left the Common Point between 9:00 and 9:30 p.m.
Plaintiff estimated that she had five or six glasses of wine and a few hors d'oeuvres while she was at the Common Point. Bennett said that when she arrived at the Common Point, plaintiff was drinking a beer and that while she was with plaintiff, plaintiff probably had three or four glasses of wine. Plaintiff said that when she left the Common Point she was "feeling good"; Bennett said that she and plaintiff were "pretty loaded" when they left, but that plaintiff did not appear to be intoxicated. Barksdale said plaintiff was "very silly actingnot stumbling or falling or anything like that, but ...in a lot more party mood" from when he had met her previously. However, plaintiff, Bennett, and Barksdale all said that the plaintiff had control of herself, and Clark said that the plaintiff never appeared intoxicated.
Clark arrived at her house first and was in the kitchen when Barksdale and plaintiff came in. It is disputed whether plaintiff and Barksdale stopped off to buy beer prior to arriving at Clark's home and whether they brought it into the house. The outdoor light switch was in the utility room just off the kitchen, and Clark had turned the lights on as she walked in. There were three sets of outdoor floodlights for the backyard and pool area; there was also a streetlight which shone into Clark's backyard.
According to Clark and Barksdale, plaintiff commented immediately that there was too much light. Clark testified that she asked everybody to go outside first before she turned off the floodlights so she could check for snakes.[1] Plaintiff, Barksdale, and Clark all walked outside, and Clark jokingly said, "This is the shallow end and *360 this is the deep end." Prior to the accident, plaintiff had been in the backyard pool area approximately nine times during the five years that Clark had the pool. However, plaintiff testified that she had not been in the pool area for a year and a half before the accident until July 4, 1984, when she actually went in the pool for the first time. On July 4, 1984, a little over a week prior to the accident, plaintiff was in the pool for approximately two to three hours in the daytime. During that time, she could not remember drinking any alcoholic beverages; she also never dove into the pool, but simply floated around on a raft. She testified that she knew which end was shallow and which was deep.
Cazes joined the group last. He and Barksdale sat together outside while the women went inside. Cazes had a drink; it is disputed whether the others were each drinking beer. When both women came out of the house, plaintiff was wearing a towel or a robe, and Clark a swimsuit. It is disputed whether Clark was to remove her swimsuit and whether the group was to go skinny-dipping. All four were gathered around a table located near the shallow end of the pool. A diving board was at the deep end. A slide was also on one side of the deep end of the pool. The pool was built in a figure-eight shape; the shallow end was much smaller than the deep end. There was no rope or other device marking the drop-off between deep and shallow water.[2] The shallow end was three feet deep; the drop-off to the deep end was sudden, and the deep end was eight or nine feet deep. Plaintiff testified that she knew there was a drop-off. There were no depth markers on the vinyl underwater liner, there were no warning signs, and there were no underwater lights in the pool.
Barksdale was seated facing the pool; Cazes, opposite him, turned his chair so his back was to the water. Clark was to Cazes' left, plaintiff to his right. Plaintiff was in Clark's line of vision and directly in Barksdale's view. The four were talking and visiting, and some or all were drinking beers.
Shortly after the four had gathered at the table, and at some point before 10:00 p.m., plaintiff left the group and dove into the pool. Cazes was aware that plaintiff walked behind him to go to the pool, but he did not see her approach the pool or dive into it. Clark saw plaintiff dive, but she did not actually see her enter the water. Barksdale saw plaintiff approach the pool but he did not see her dive or enter the water. Plaintiff, Clark, and Barksdale all give conflicting versions of plaintiff's approach to the pool and the location from which plaintiff dove into the pool.
Clark noticed that plaintiff was not coming back up immediately and commented to the others that something must be wrong. She was moving slowly; Cazes testified he could see her body underwater, apparently with the light from the streetlight. She was moving toward the side of the pool, in the shallow end. Clark got in the water to help her, and the two men lifted her out of the water and placed her on the side of the pool. An ambulance arrived shortly, and emergency technicians took over. Plaintiff is completely paralyzed at this time.
The only question presented on appeal is whether there was no genuine issue of material fact such that Clark, Allstate, and Cabana were entitled to summary judgment as a matter of law under LSA-C.C.P. art. 966. The following principles regarding motion for summary judgment are well established in our jurisprudence:
Summary judgment should be granted cautiously and sparingly, with any doubt as to the existence of issues of material fact to be resolved against granting the motion. Further, a motion for summary judgment is not a substitute for trial, and it is not the function of the trial court in considering such a motion to weigh conflicting evidence or to consider the likelihood of the plaintiff prevailing on the merits. Finally, summary judgment *361 should be granted only if reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law.
Zumo v. R.T. Vanderbilt Co., 527 So.2d 1074, 1078 (La.App. 1st Cir.1988). (Citations omitted). Based on these principles, we find that this matter should not be resolved on a motion for summary judgment, but rather by trial on the merits.
Plaintiff argues in brief and on oral argument that Clark was negligent and that the pool was unreasonably dangerous because of (1) improper lighting, (2) lack of depth markings, (3) lack of warning signs, (4) the lack of a rope separating the deep end from the shallow end, (5) the coefficient of friction of the vinyl liner, and (6) the bulging design of the pool.
As a landowner, defendant Clark owed plaintiff a duty to discover any unreasonably dangerous condition on the premises, and either to correct it or to warn of it. Carter v. Board of Supervisors of Louisiana State University, 459 So.2d 1263 (La. App. 1st Cir.1984), writ denied, 462 So.2d 1248 (La.1985). This duty does not extend to those potentially dangerous conditions which should have been observed by an individual in the exercise of reasonable care or which are as obvious to the visitor as they are to the landowner. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406, 410 (La.1976). (Citations omitted).
As to Cabana, the installer of the pool, in order to be liable to plaintiff under negligence, a duty-risk analysis must be employed, whereby each of the following questions must be answered in the affirmative: (1) did it owe a duty to the plaintiff? (2) was this duty breached? (3) was the breach of duty a substantial factor in bringing about harm to the plaintiff, i.e., was it a cause in fact of the harm which occurred? and (4) do the risk and harm encountered by the plaintiff fall within the scope of the protection afforded by the duty breached? See Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
Plaintiff has made the same allegations against defendants in strict liability as in negligence, asserting that the same factors which may render defendants negligent also render them strictly liable under LSA-C.C. art. 2317. As for Clark, the custodian of the pool, the inquiry is the same. Assuming that defendant Clark had knowledge of the defects alleged to exist, did such defects create an unreasonable risk of injury to persons on the premises? LSA-C.C. art. 2317; Carter, 459 So.2d at 1265-66.
As to Cabana, the installer of the pool, if plaintiff is attempting to hold Cabana liable under strict products liability, the plaintiff must prove that: (1) the product was defective, i.e., unreasonably dangerous to normal use, (2) the product's defect caused the injury, (3) the injury might reasonably have been anticipated by the manufacturer, and (4) the product was in normal use at the time the injury occurred. Hunt v. City Stores, Inc., 387 So.2d 585 (La. 1980).
There is sufficient evidence for us to determine that there are genuine issues of material fact such that defendants are not entitled to summary judgment relieving them of liability under negligence or strict liability.[3] These issues concern the lighting *362 in the pool area, plaintiff's actions before and while executing her disastrous dive, and plaintiff's familiarity with the pool.
When asked about the lighting at the time of the accident, plaintiff said that she could not really see the bottom but that she knew approximately where it dropped off. Cazes said that he could see the drop-off as well as plaintiff under the water. Barksdale testified that plaintiff complained that there was too much light even with the floodlights out, and that he thought that the pool was well lit by a bright moon, a streetlight, and house lights. However, Clark, the person most familiar with the area, testified as follows:
Q. What are the lighting conditions like in your pool area?
A. Good; you can see.
Q. What can you see?
A. The pool. You can see everything because there's a street light [sic] that shines in the backyard. And it's dimly lit back there. You can see anything you want to see.
Q. Are you able to distinguish between the deep end and the shallow end?
A. Yes, yes.
Q. How are you able to do it when the spotlights are not on but it's at night and the streetlights are on? How can you tell the difference in the shallow and the deep end?
A. Well, you've got a good point there, but she had been in the pool so she would know which was the shallow and the deep end.
Q. All right; but, I mean, is it a different coloration or what? I'm just trying to figure out how you can tell the difference.
A. It couldn't be a different coloration because it'd be in the dark. You'd just have to know, I guess.
Q. Were you able to tell the difference just by looking down?
A. Well, I didn't go to the deep end too much since I don't swim. So, you know, I don'tI couldn't tell you, because I'm not in that deep end, you know, especially at night, you know, but I would say there'd be nothere couldn't be a coloration in the dark. That's just from common sense. I mean, I'm just figuring this thing out.
Furthermore, although there is no dispute concerning the absence of depth markers or a rope, among other things, based on these factors we can not say that defendants would be entitled to a summary judgment as a matter of law. Although the trial court found that plaintiff failed to ascertain that she could safely make her dive, and that her conduct was the sole cause of the accident, we find that there is a factual issue as to whether or not the dangers of diving into the shallow water were obvious to the plaintiff or any other visitor based on the factors set forth by plaintiff. At the time of plaintiff's accident, plaintiff had been drinking and may have been affected by her alcoholic consumption, and defendant Clark may or may not have been aware of plaintiff's capabilities while under the influence of the alcohol. These factors were not present in plaintiff's first swim in the pool on July 4, 1984. Additionally, it is not a question of which end was deep and which was shallow but rather the location of the drop-off and the lack of markings or dividers which would have reflected such division.
For the reasons set forth, the judgment of the trial court dismissing plaintiff's suit as to Clark, Allstate, and Cabana is reversed. This case is remanded for proceedings consistent with this opinion. Costs of this appeal are to be apportioned equally among these three defendants.
REVERSED AND REMANDED.
SHORTESS, J., dissents with reasons.
SHORTESS, Judge, dissenting.
Nita M. Dietrich dove into the shallow end of a swimming pool. Lighting is not *363 an issue of material fact because plaintiff testified she was able to see which end of the pool was which. Neither is the fact that she had been drinking, when everyone concerned testified she was not intoxicated. Her familiarity with the pool is likewise not contested.[1] At a future trial of this matter, no new facts could be introduced. In my opinion, defendants carried their initial burden of production of evidence, as movers for summary judgment, by convincing the trial court that there was no issue of material fact as to causation.[2]Nathans v. Vuci, 443 So.2d 690 (La.App. 1st Cir.1983). Additionally, defendants convinced the trial court that plaintiff could not prove any unreasonable defect existed because the potential danger of diving into the shallow end of a swimming pool was obvious to all comers. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976); Thompson v. Ewin, 457 So.2d 303 (La.App. 3d Cir.), writ denied, 460 So.2d 1043 (1984). Under those facts, there is no unreasonable defect.[3]Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988).
Once movants satisfied their initial burden of production, the burden shifted to plaintiff to produce evidence establishing a claim. LSA-C.C.P. art. 967. All Dietrich produced here were affidavits of expert witnesses, not admissible under LSA-C. C.P. art. 967 and purely speculative in nature, which attempted to draw inferences from uncontested facts. I am of the opinion that defendants met their burden and, as a matter of law, are entitled to judgment because plaintiff, when confronted with defendants' evidence, did not produce countervailing evidence which established a claim.
It is unfortunate that in a case like this, where five deponents told virtually identical stories all showing that plaintiff knew her way around the pool, asked that the lights be turned out for her own reasons, and knew which end was shallow and yet chose to dive in it, the majority finds such issues of material fact as to require a trial. I suggest it is time the judicial attitude toward summary judgments be re-examined. Even conceding the differences between state and federal law, this case vividly illustrates what the United States Supreme Court had in mind when it said, "One of the principal purposes of the summary judgment rule[4] is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." See Celotex Corporation v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
I respectfully dissent.
NOTES
[1] A drainage ditch flowed just behind her lot and small snakes got into the pool at times.
[2] When the vinyl liner was originally installed (by a contractor other than Cabana), a rope was put across the pool. This rope rotted, according to Clark, and when the liner which was in the pool at the time of plaintiff's accident was installed by Cabana, Cabana did not supply a rope nor did Clark ask for one.
[3] We initially note that in arriving at our conclusion that the trial court erred in granting the motion for summary judgment, we have not considered the affidavit of Dr. Gabrielsen. Gabrielsen's affidavit states first that he has examined, photographed, and taken measurements of the pool. No date is specified in the affidavit for the inspection. The rest of the affidavit is derived from Gabrielsen's review of depositions, and from his conclusions as to possible causes of plaintiff's accidentthe absence of depth markers, lighting, warning signs, a rope, as well as the improper design of the pool because of a low coefficient of friction of the vinyl liner. In reaching these conclusions, Gabrielsen relied heavily on the results of studies set forth in his own work, Diving Injuries: Prevention of the Most Catastrophic Sport Related Injuries. (A copy of that work was attached to his affidavit.) LSA-C.C.P. art. 967 requires that supporting and opposing affidavits be made on personal knowledge and set forth such facts as would be admissible in evidence. It is clear that Gabrielsen's affidavit was not based upon personal knowledge and is thus fundamentally defective. Bartlett v. Calhoun, 430 So.2d 1358 (La.App. 3d Cir.), writ denied, 438 So.2d 575 (La.1983). The conclusions Gabrielsen set forth in the affidavit are based primarily upon his own prior studies, and not upon personal knowledge. Hidalgo v. General Fire & Casualty Company, 254 So.2d 493 (La.App. 3d Cir.1971); see also Rhines v. Carpenter, 465 So.2d 884 (La.App. 2d Cir.1985).
[1] Although the majority opinion states Dietrich had been in the pool nine times in the five years since Clark installed it, it fails to take into account the fact that there was a period of time, at least a year and a half during those five years, when Clark and Dietrich had not seen each other; they had renewed their acquaintance within the year before the accident.
[2] The trial court dismissed this suit after finding that the sole cause of the accident was plaintiff's negligence. It also found no breach of duty as to Clark.
[3] The trial court also found that the pool was not unreasonably dangerous for its intended use.
[4] It is noted that LSA-C.C.P. art. 966 is based on Fed.R.Civ.P. 56(a)-(c), and thus the jurisprudence of federal appellate courts interpreting the federal rule is persuasive. Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963).